JOHN H. LOWE, TRUSTEE, *vs.* THE CONVENTION
OF THE PROTESTANT EPISCOPAL CHURCH
IN THE DIOCESE OF EASTON, ET AL.

*Trusts and Trustees—Power of Trustee Appointed in Equity in Place
of Testamentary Trustee—Liability of Trustees—Release of Part
of Property Mortgaged by Short Form on Record—Ratification
by Cestui Que Trust of Unauthorized Release of Mortgage by
Trustee—Estoppel—Agreement to Release.*

A testator bequeathed property to two named trustees to be invested
in their discretion in some safe manner during the lives of the *cestuis
que trustent*, with power to appoint successors in the trust by last
will. The trustees died without having named their successors and
a new trustee was appointed by a Court of Equity. *Held*, that the
substituted trustee did not possess the discretion as to investments
reposed in the original trustees by the will.

If such substituted trustee wishes to avoid responsibility for losses
arising from unprofitable investments, he should first obtain author-
ity to make them from the Court having jurisdiction over him, unless
his discretion and powers are undoubted.

The short form of release of mortgage provided for by Code, Art. 21,
sec. 34, does not authorize the release of a part of the property mort-
gaged by that method so as to pass the legal title to the same, al-
though such writing may have the effect of an agreement to release.

When a mortgage to a trustee is overdue he cannot release a part of
the property covered by the mortgage, so as to pass the legal title,
by signing a release of the same under seal on the record-book at
the foot of the mortgage, without consideration or order of Court.

But the act of a trustee in executing such a release is binding upon him,
and when the same has been ratified by his successor in the trust
and by the *cestuis que trustent*, such mortgage cannot be enforced
against a subsequent purchaser for value.

A trustee appointed by a Court of Equity executed a release on the
record-book of part of the property covered by an overdue mortgage
to him as trustee, without consideration and without an order of
Court. Subsequently the *cestuis que trustent*, with knowledge of the
facts, agreed to accept the securities then held by the trustee and re-
lease him from further liability, and he agreed to resign the trust. A
new trustee was then appointed, to whom the securities were deliv-
ered. *Held*, that such release was ratified by the *cestuis que trus-
tent* and the new trustee and that the mortgage could not be enforced
against a subsequent mortgagee of the property so released.

Appeal from a decree of the Circuit Court for Talbot County (STUMP, J.), dismissing appellant's petition.

The cause was argued before McSHERRY, C. J., BRYAN, FOWLER, BRISCOE and BOYD, JJ.

*John Prentiss Poe* (with whom was *J. F. Bateman* on the brief), for the appellant.

*James A. Pearce* and *Wm. H. Adkins*, for the appellee.

BOYD, J., delivered the opinion of the Court.

James M. Seth, of Talbot County, departed this life leaving a last will and testament by which he bequeathed a large personal estate to his wife and his son-in-law in trust for his two daughters, Mary Lowe and Sallie Covey, with remainder to their children. He directed that no part of the principal should be paid to his daughters during their lives, " but shall remain in the hands of my said executors, who are also hereby specially constituted trustees for such uses, purposes and trusts, or in the hands of the survivor of them, and in the event of the death of both in the lifetime of my said daughters, in the hands of such person or persons as they, or the survivor of them, may by last will and testament nominate and appoint to be my said executors and trustees, or the survivor of them, or by such person or persons named by them as aforesaid, invested in their discretion in some safe and profitable manner during the natural life of my said two daughters," etc. He then directed that the income, interest and profits should be paid to his daughters during their natural lives, and at their death to the children of his daughters, and provided for the child of any deceased child of either of his daughters taking his parent's share. The trustees named in the will died without naming their successors, so far as disclosed by the record, and J. Frank Turner was appointed trustee by the Circuit Court for Talbot County, " to execute the trusts created by the last will and testament of James M. Seth, deceased, in favor of Mary F. Lowe and her children."

It is only the Lowe interest that is affected by this appeal, and it will be unnecessary to refer to other portions of the will. Mr. Turner duly qualified and took control of the trust estate. He invested a large amount of the fund in mortgages, but did not obtain the sanction of the Court before doing so. On August 1st, 1878, he loaned George W. Minnick three thousand dollars of the fund, secured by a mortgage on two properties—one in Kent County and the other in Easton, Talbot County—payable one year after date. On September 23rd, 1887, he executed at the foot of the mortgage on the record-books of Talbot County the following writing : " I hereby release the dwelling and store-house in the town of Easton, Talbot County, Md., from the operation of the foregoing mortgage. Witness my hand and seal, this 23rd day of Sept., A. D. 1887. J. Frank Turner, Trustee. [Seal]." He, as attorney for C. J. Bonaparte, then loaned Minnick three thousand dollars on a mortgage on the Easton property and a farm in Talbot County, which was subsequently released, and on December 16, 1891, Minnick and wife executed a mortgage to the appellee on the Talbot County property to secure the sum of three thousand dollars, payable five years after date. Some time afterwards the *cestuis que trust* endeavored to have Mr. Turner removed, which the Court refused to do, but on July 25, 1892, he voluntarily resigned. Before doing so, however, he entered into an agreement, under seal, with all the *cestuis que trust,* including the appellant, who was one of them, in which there was a list of seventeen mortgages held by Turner referred to (the names of the mortgagors and the amounts being stated), which, together with the cash on hand, amounted to forty thousand dollars. Certain agreements were therein made, some of which we will have occasion to refer to more particularly. On July 25, 1892, the Court passed an order directing Mr. Turner to transfer and assign these mortgages and the money to " John H. Lowe as trustee for the said Mary E. Lowe and her children under the will of James M. Seth, as soon as he shall

have filed his bond as required by the decree appointing him." He duly qualified and received the mortgages and cash from Turner, including the Minnick mortgage, which was the first named in the list, and which was assigned to the appellant by endorsement on the original mortgage. On December 28, 1892, the appellant took a new mortgage from Minnick and wife, with a note for the sum of three thousand dollars, payable five years after date, and ten interest notes, one payable every six months. On December 29, 1892, the appellant wrote a short release, as prescribed by the statute, on the mortgage originally given to Turner, and sent it, together with the note which it secured, to the clerk of the Circuit Court for Kent County, which release was duly recorded and the original kept by the clerk, as required by the statute. In April, 1894, Minnick made a deed of trust for the benefit of his creditors, and by permission of the creditors his trustees sold the Talbot County property. The appellant sold the Kent County property under his mortgage, there having been a default. The Kent County property did not realize sufficient to pay the mortgage held by the appellant, and he now claims that under the circumstances the Turner mortgage is still valid against the appellee on the proceeds of sale of the Talbot County property, the release of his mortgage not having been filed in that county.

A number of questions were argued, some of which are not very material under our view of the case. The one that the above statement of facts would first suggest is, whether the discretion reposed in the trustees named in the will was vested in Mr. Turner by his appointment under the decree of the Court. We have no hesitancy in answering that in the negative. The trustees appointed by the testator were his wife and son-in-law, the survivor of them or "such person or persons as they or the survivor of them may by last will and testament nominate and appoint to be my said executors and trustees, or the survivor of them, or by such person or persons named by them as aforesaid." To such

persons he gave power to invest " in their discretion in some safe and profitable manner during the natural life of my said two daughters," etc., but he did not authorize and cannot by us be declared to have meant that a trustee appointed in some other way—by the Court for example—should have such discretion.   We are of the opinion that the case of *Zimmerman* v. *Fraley*, 70 Md. 561, is conclusive of the question and that the cases of the *Safe Deposit and Trust Company* v. *Sutro*, 75 Md. 361, and *Druid Park Heights Company* v. *Oettinger*, 53 Md. 46, cited by appellee, are not applicable.   A Court of Equity will not permit a trust to fail for want of trustees and will appoint one to carry out the trust, so far as it can, but it by no means follows that it will or can give him all the freedom from responsibility and the unlimited powers that a testator may confer upon those selected by himself.   A trustee may act with the best intentions and the utmost good faith, and whilst his not seeking the aid and instruction of the Court may be no evidence to the contrary, yet if he wants to avoid responsibility for losses by reason of investments which may prove to be unprofitable or worthless, he should first obtain authority from the Court having jurisdiction over him, unless his discretion and powers are undoubted.   In this case there is no evidence of any bad faith on the part of Mr. Turner, but it is clear that he took the risk of the investments being safe and he was not authorized to make or change them at his pleasure, even if *bona fide* done, without being responsible to the *cestuis que trust.*

Nor do we think that the form adopted by him to release the Talbot County property was sufficient to pass the legal title to it.   The mortgage was overdue, and hence there had been a default.   The legal title was therefore vested in the mortgagee, and such being the case, the attempted release made by him was not sufficient to reconvey it to the mortgagor.   The statute has adopted a short form for the *release of a mortgage* which can be executed either by writing it on the record in the office where the mortgage is

recorded and having it attested by the clerk, or by endorsing it on the original mortgage and filing it in the office, in which event the clerk must retain it. The statute has not, however, authorized the release of a portion of the property from the operation of the mortgage by that method so as to pass the legal title. But while that is true a Court of Equity can and should recognize such an act if otherwise a third person would be prejudiced thereby, for it would not be in accord with justice to permit a mortgagor to proceed against property so attempted to be released after agreeing under seal that he would not proceed against it in case of default, which is in effect the meaning of this writing, and thereby induce an innocent person to purchase or lend money on the property. It should at least have the effect of an agreement to release or of a deed of release that has been signed but not acknowledged. It would not be constructive notice, but would bind those having actual knowledge of the transaction. We, of course, only refer, in what we have just said, to the *form* of this attempted release and not to the question as to whether Mr. Turner could, as trustee, execute any release of a part of the property included in the mortgage to the detriment of the *cestuis que trust*, unless consented to or ratified by them.

The appellant subsequently executed a release of this mortgage and filed it with the clerk of Kent County, as above stated. He contends that he purposely withheld the release from the Talbot County records, and that it was not intended to discharge the property in that county. It was certainly a novel way to keep the mortgage operative on the Talbot County property—to endorse a release on the original mortgage and file it with the clerk of Kent County. But he surrendered the evidence of his debt with the mortgage—that is to say, he sent it attached to the mortgage to the clerk, and the law requires the clerk to " retain such mortgage in his office and not permit the same to be again withdrawn." In order to release the Kent County property from the effect of the mortgage it was not necessary to send the note or to release the whole mortgage, that could

have been done by a separate release as to that property and still retain the note so as to hold it against the property in the other county. Mr. Lowe's explanation is : " I wrote a short release on the mortgage and sent it to the clerk in Kent County ; it was simply because the property was away from my home and if at any time the captious convey-ancer, if the property was sold by Mr. Minnick, at any time after the mortgage should be paid off and should not draw a release of the renewal mortgage, a clean record." The record has doubtless omitted part of his language, but what he intended to say is evident. There certainly could not be a " clean record" before the " renewal mortgage " was paid and released, and if the intention was to continue in force the original mortgage, why could he not have waited to release both when the money was paid ? If the appellant's contention as to the value of the Kent County property be correct there was no probability of Minnick being able to sell the property subject to a three thousand dollar mortgage. It is true that the mortgage to Lowe recites the fact that Minnick was indebted to him as trustee in the sum of three thousand dol-lars, which sum is secured by a mortgage to Turner, trus-tee, recorded in the land records of Kent and Talbot Coun-ties, but that recital is not inconsistent with the intention to release the Turner mortgage, as it was perfectly proper to refer to it as the basis of consideration for the new notes and mortgage. The conduct of the appellant is strong, if not conclusive, evidence that it was intended to release the original mortgage. But let us examine the evidence as to the Talbot County property. There is nothing in the rec-ord to impeach the character of any of the witnesses, but there is a manifest conflict between the testimony of the ap-pellant and that of three witnesses offered by the appellee. He testifies that he did not know of the attempt to release the Talbot County property until after Minnick made the deed of trust. Minnick swore that in the interview with the appellant about the renewal of the mortgage, " Mr. Lowe said a new lien would necessarily have to be given upon the

Easton property, inasmuch as the old mortgage upon the same had been released by Mr. Turner ; I asked is there not still a claim upon the Easton property (or words to that effect) ; Mr. Lowe said No, as the release given by Mr. Turner had been absolute or was absolute." W. R. Martin testified that Mr. Lowe remarked to him after Minnick's failure, in a conversation about the Kent County property, " Of course I knew about the Easton property, that there was nothing in that for me." Mr. Turner testified that he agreed with Mr. Lowe for himself and the others interested, that he would resign if they accepted the securities he then held and relieved him from further responsibility on account of the trust ; that he told Mr. Lowe he could examine the securities in the clerk's office, confer with his sisters and mother and let him know ; " that he subsequently came to my office and told me that he had examined the records ; that he had conferred with his mother and sisters and they were ready to accept my proposition, take the securities as I held them and release me from further responsibility on account of the trust, and in pursuance of that declaration this agreement, marked " Deft's. Ex. M." (the one above referred to) was prepared by me and signed by all the parties in interest, and when this paper was brought to me executed I resigned the trusteeship." He also said that after Mr. Lowe qualified he went to him to get the securities, and " when I began to make the transfer to him and read without guarantee or recourse, I distinctly remember when he came to the Minnick mortgage he referred to the fact that the mortgage only rested on the farm in Kent County, and we had some discussion about the Kent property and its value. I distinctly remember of telling him the estimate Mr. Minnick placed upon the property and of Mr. Minnick's ability to pay, which I thought at that time was ample ; and he took that with the other securities without guarantee or recourse, with the knowledge as he at that time stated to me, that the house and property in Easton had been released. I delivered the securities and he accepted them."

Mr. Lowe admits that Mr. Turner gave him a list of securities held by him, but alleges that he represented to him "that they were all right as they appeared and that nothing had been done to affect them, and asked me to enquire into the property that they covered and see if I thought they were such as I would be willing to accept." He denied the statements made in reference to this property, by the three witnesses above mentioned, and was flatly contradicted by them. The agreement referred to by Mr. Turner recited the fact of Turner's appointment as trustee; that he had received into his hands cash and securities amounting to forty thousand dollars; that he had from time to time made investments; that he then had in his hands certain investments, which were named, with Minnick's at the head of the list; that Turner proposed to resign and Mary F. Lowe, John H. Lowe, Lulie S. Ensey, Lot Ensey, her husband; Blanch L. Butler and Nathan R. Butler, her husband, were willing to accept the aforesaid securities, investments and cash in full payment and satisfaction. The *cestuis que trust* and the husbands of the two married ladies then agreed that upon the resignation of Turner and the transfer of the mortgages and securities recited, and the payment of the cash to his successor to be appointed, to " execute a release in full of all claims or demands which they may have now or hereafter by reason of said principal sum of forty thousand dollars as set forth and stated."

We cannot hesitate to find under the evidence that the appellant did know that Turner had released, or at least had attempted to release, the Easton property, and that he accepted the securities with that understanding, and he and the other *cestuis que trust*, whose attorney and agent he was in this transaction, are bound by his act. It could not be pretended that under such circumstances they could hold Turner responsible, for they expressly agreed to release him, and that too with full knowledge, as shown by the testimony, of all the facts necessary to inform them of the true condition of the securities, for the knowledge of John H.

Lowe, the agent of the other *cestuis que trust*, was notice to them.   It is true that Turner certified at the bottom of the list he furnished the appellant before his resignation, " I examined the titles to the property upon which the investments rest as liens before making the same and found them, in my opinion, correct in every respect," and inserted in the agreement made with the *cestuis que trust* " the securities and titles upon which they rest were examined by the said party of the second part (Turner), and found by him to be correct in every particular ;" but neither Turner nor appellant supposed that the Minnick mortgage *rested* upon the Easton property according to the evidence of Turner, which is corroborated by Martin and Minnick, and the fact that appellant sent the *release of the mortgage* itself to Kent County is altogether inconsistent with the idea that he supposed it was still a lien on the Easton property.   Another very significant fact is that although the appellant testified that his mother was present when Mr. Turner gave him the list of securities and made the statements attributed to him, yet she is not called as a witness and no explanation of her absence is given.

It is clear, then, that although Turner did not make the investment or release the Easton property under authority of the Court, yet the *cestuis que trust* ratified and sanctioned his act, and thereby induced him to relinquish a valuable trust.   It is possible that if Turner had not resigned he might have collected all the money from Minnick, as he might not have extended the time of payment and his resignation was nearly two years before Minnick made an assignment.   In 1892 the Kent County property might have been worth the amount of the mortgage.   But if he had been unable to collect the money from it, he was personally responsible for the same to the *cestuis que trust* before they executed the agreement, and would have been under moral obligation, if not legal, to protect the appellee from any loss occasioned by his act in thus attempting to release the Easton property.

The appellant states in his petition that he, too, acted without authority of the Court in executing the release. But is a trustee to have the aid of a Court of Equity to relieve him from possible personal liability, especially when he is one of the *cestuis que trust* and attorney and agent of the others, because he acted without its authority ?   Courts of Equity will unhesitatingly use its powers to preserve and protect trust property at the instance of *cestuis que trust*, who are not themselves estopped or precluded on some equitable grounds, but it would be an unwarranted stretch of that power to apply it in favor of a trustee confessedly acting without authority *under ordinary circumstances*, and without any precedent to do so when all the *cestuis que trust* were parties to the arrangement which resulted in his act.   In point of fact, his taking a new mortgage probably did not place the *cestuis que trust* in any worse condition as to the Easton property than they were before by their own sanction and ratification, but if it did, it would not entitle the trustee to relief against the appellee.

Being of the opinion that the writing of Turner, although not a valid release in a Court of Law, is in a Court of Equity binding on him, and as his act was fully ratified and sanctioned by the appellant and the other *cestuis que trust*, is binding on them, and the mortgage of the appellee must be given priority over the claim of the appellant.   The decree therefore must be affirmed.

*Decree affirmed, with costs to the appellees.*

(Decided June 17th, 1896).